*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LINDA LOCOCO, Individually and as Executrix of the estate of and on behalf of Joseph S. LoCoco,
  *Plaintiff-Appellant,*

  *v.*

MEDICAL SAVINGS INSURANCE CO.,
  *Defendant-Appellee.*

No. 07-3973

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-01012—Norah McCann King, Magistrate Judge.

Argued: April 22, 2008

Decided and Filed: June 23, 2008

Before: GILMAN, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Richard Lee Lancione, LANCIONE & LLOYD LAW OFFICE, Bellaire, Ohio, for Appellant. Douglas N. Godshall, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellee. **ON BRIEF:** Richard Lee Lancione, LANCIONE & LLOYD LAW OFFICE, Bellaire, Ohio, for Appellant. Douglas N. Godshall, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge. Plaintiff Linda LoCoco appeals the grant of summary judgment in favor of defendant Medical Savings Insurance Co. in this suit over medical benefits coverage. Shortly before her husband's health insurance coverage from Medical Savings became effective, he was treated for a respiratory ailment that was later diagnosed as lung cancer. Medical Savings denied coverage for the cancer for the first year of the policy, concluding that the disease was a "pre-existing condition." Medical Savings later cancelled subsequent coverage for failure to pay premiums. Plaintiff then brought suit, claiming that the denial was improper because the cancer was not diagnosed until after the policy took effect and that the cancellation was ineffective for lack of notice. Because the terms of the policy provided both for the denial of benefits and the automatic termination of coverage under these circumstances, we affirm the grant of summary judgment.

**I.**

During the summer of 2001, Joseph LoCoco, the insured, began to experience pain in his chest. By November of that year, he was also suffering from a dry cough. During a November 26, 2001 visit, Mr. LoCoco's family doctor, Dr. Satinder Bhullar, ordered a chest X-ray "just to see if there was any process going on in the lungs." It does not appear, however, that Mr. LoCoco had this X-ray taken. Dr. Bhullar also noted that Mr. LoCoco was still a pack-a-day smoker, despite his being previously advised to quit smoking. Because of Mr. LoCoco's cigarette habit and chest pain, Dr. Bhullar believed that Mr. LoCoco could be a candidate for lung cancer "at any time."

Prior to this point, Mr. LoCoco and his wife had gone without insurance for "years and years." But, recognizing that they "were getting older" and that "[e]verybody needs it," the LoCocos applied for health insurance from Medical Savings on May 8, 2002. They did not mention on their application that Mr. LoCoco had recently been experiencing respiratory difficulties. Medical Savings accepted the LoCocos' application, issuing illness insurance effective May 29, 2002.

Shortly after his applying for insurance, Mr. LoCoco's health began to deteriorate. On May 14, 2002, he was admitted to a local emergency room, complaining of a cough and shortness of breath. An X-ray of Mr. LoCoco's chest revealed what appeared to be a "cloud" in his left lung. Based on these findings, follow-up films were suggested, "as an obstructive endobronchial lesion [could not] be ruled out." The LoCocos were told that a CAT scan was necessary because the abnormal X-ray concerned his doctors. However, Mr. LoCoco was diagnosed only as having pneumonia at this time.

The next day, Mr. LoCoco visited Dr. Bhullar, who ordered a CAT scan to determine "if there's a mass in the lung." "Whenever you see something like [pneumonia] in a smoker, you have to follow up for cancer of the lung." This is because, Dr. Bhullar explained, pneumonia can sometimes follow lung cancer. "The cancer often causes an obstruction of the airway. Secretions collect behind it and the lung tissue tends to get infected[,] causing pneumonia." He acknowledged, however, that many smokers who develop pneumonia do not also have lung cancer.

Mr. LoCoco's CAT scan did not reveal whether there was, in fact, cancer in his lungs. It showed only left upper lobe consolidation/collapse in the lungs, along with possible swelling of the lymph nodes and narrowing of the left upper lobe airway. A bronchoscopy was consequently suggested for further evaluation. According to another physician who treated Mr. LoCoco, this procedure is only ordered when there are "very strong indications" of disease. Dr. Bhullar also referred Mr. LoCoco to Dr. Attila Lenkey, a pulmonologist who often treated patients with lung cancer.

Mr. LoCoco first consulted with Dr. Lenkey on May 29, 2002, the date on which his policy went into effect. During that visit, Mr. LoCoco related that he was having increased problems breathing, was experiencing a dry cough, and had some streaking of blood when coughing. On physical examination, Mr. LoCoco's lymph nodes appeared normal, though Dr. Lenkey did notice that Mr. LoCoco made abnormal noises when breathing. All in all, Dr. Lenkey concluded that it was "[n]ot a very abnormal physical exam." Nonetheless, Dr. Lenkey was still of the opinion that the emergency room X-ray "certainly looked suggestive of a tumor in the left upper lung." Moreover, given Mr. LoCoco's smoking habit, symptoms, and X-ray and CAT scan results, lung cancer was "up high" on Dr. Lenkey's list of diagnoses.

The following day, Dr. Lenkey performed a bronchoscopy on Mr. LoCoco. That procedure confirmed what the earlier X-ray and CAT scan had suggested—that Mr. LoCoco had a "[l]arge polypoid lesion" in his lungs. Dr. Lenkey biopsied the lesion for laboratory analysis. While Dr.

Lenkey could not yet be certain that the lesion was cancerous, he was "highly suspicious" that Mr. LoCoco had lung cancer. During a follow-up visit on June 5, 2002, Dr. Lenkey "first told [the LoCocos] with some certainty that [Mr. LoCoco] had cancer." Plaintiff testified that she had not believed that Mr. LoCoco had lung cancer prior to this date because "he was never sick, never hospitalized." On June 19, Mr. LoCoco was given a definitive diagnosis.

As Mr. LoCoco incurred medical bills for his treatment, he submitted them to Medical Savings for payment. However, on September 4, 2002, Medical Savings informed the LoCocos that Mr. LoCoco's cancer was a "pre-existing condition," and, under the terms of the policy, would not be covered for the first twelve months of his insurance. This denial was confirmed in a January 15, 2003 letter. A little over a month later, Medical Savings cancelled coverage entirely due to the LoCocos' failure to pay their premiums. The LoCocos' premiums were to be automatically withdrawn from their checking account around the 15th of every month. When Medical Savings attempted to withdraw payment for the LoCocos' January premium, however, that withdrawal was returned for lack of sufficient funds. Medical Savings purports to have notified the LoCocos of the withdrawal's return in a January 22, 2003 letter. Having not received payment by the end of that February, Medical Savings cancelled the LoCocos' coverage. Plaintiff denies that the LoCocos ever received notification of non-payment from Medical Savings. According to her deposition, the LoCocos were unaware of the cancellation until several months later, when Medical Savings "sent all [of their] money back."

After battling his cancer for almost a year, Mr. LoCoco passed away in the spring of 2003. Prior to his passing, Mr. LoCoco had required extensive medical care. One of those medical providers subsequently sued Mrs. LoCoco over the non-payment of bills associated with this care. She then brought suit, individually and on behalf of Mr. LoCoco's estate, against Medical Savings in the Belmont County (Ohio) Court of Common Pleas. In her complaint, plaintiff alleged that Medical Savings had improperly denied coverage and cancelled the policy, and that it had acted in bad faith in taking both actions. According to plaintiff, Medical Savings owed her $124,000 in medical benefits, plus interests and costs. Shortly thereafter, Medical Savings removed the case to federal district court on the basis of diversity jurisdiction. The parties consented to have the case referred to a magistrate judge. Medical Savings moved for summary judgment on all claims against it.

The magistrate judge granted Medical Savings's motion on June 26, 2007. Because Mr. LoCoco's lung cancer was "an illness for which medical advice was recommended prior to the effective date of the policy, *i.e.*, May 29, 2002," the magistrate judge held that it constituted a "pre-existing condition," and was thus excluded from coverage by the terms of the policy. In so holding, the magistrate judge concluded that it is irrelevant that Mr. LoCoco was not actually diagnosed with lung cancer until after the policy went into effect. The magistrate judge similarly rejected plaintiff's claim that Medical Savings had improperly terminated the policy. Because plaintiff did not dispute that the premium went unpaid and because the terms of the insurance contract did not require notification prior to such a cancellation, the magistrate judge held that there were no genuine issues of material fact with respect to this claim. Finally, the magistrate judge concluded that no reasonable jury could find that either of these actions had been taken in bad faith, as Medical Savings had sufficient justification for both denying coverage and canceling the policy. Plaintiff now appeals.

## II.

The terms of Mr. LoCoco's policy explicitly authorized Medical Savings to deny benefits and to automatically terminate coverage under the type of circumstances presented in this case. Summary judgment for Medical Savings on all claims against it was thus appropriate.

**A.  Denial of Benefits**

Medical Savings properly denied one year of benefits for Mr. LoCoco's lung cancer, as that illness was a "pre-existing condition" for which his policy precluded coverage.  Even though Mr. LoCoco had not received a definitive diagnosis on the effective date of coverage, diagnosis of his illness was recommended from a doctor prior to that date.  Moreover, his undisputed medical history was highly suggestive of lung cancer.

Like most health insurance policies, the terms of Mr. LoCoco's policy with Medical Savings precluded initial coverage for a "pre-existing condition."  In relevant part, the policy provides that:

> We will not pay any benefits of this *policy* for *loss* due to a *pre-existing condition* or a natural progression of a *pre-existing condition* unless:
>
>> (a) the *covered person's pre-existing condition* was fully disclosed to us on the person's application for insurance under this *policy*; and
>>
>> (b) coverage of the *pre-existing condition*  has not been excluded or limited by name or specific description.
>
> However, this limitation will not apply to a *loss* incurred more than 12 months after a person first became a *covered person*.
>
> The term "*pre-existing condition*" means an *injury* or *illness*, including a *pregnancy*, for which medical advice, diagnosis, care, or treatment, including use of prescription drugs, was recommended or received from a licensed health practitioner during the 12 months immediately preceding the effective date of coverage.

Here, Mr. LoCoco had a "pre-existing condition" because prior to the effective date of coverage (May 29, 2002) he had an "illness" for which medical "diagnosis" was "recommended" from a doctor.  The illness, moreover, was an ailment that was suspected at the time to be, and was in fact, lung cancer.  After receiving an abnormal X-ray, Mr. LoCoco was advised by emergency room physicians that he needed to have follow-up diagnostic procedures performed.  Mr. LoCoco received additional advice and care during his May 15 visit to Dr. Bhullar, during which the CAT scan was taken.  Based on those test results and Mr. LoCoco's symptoms, Dr. Bhullar further advised that Mr. LoCoco visit a pulmonologist and have a bronchoscopy performed.  The literal contractual requirements for a pre-existing condition were thus met: prior to the effective date of coverage, his doctors recommended that he get a diagnosis of his illness.

This conclusion is consistent with the testimony relied upon by plaintiff that she and Mr. LoCoco were unaware that he had cancer.  In her deposition, plaintiff stated that she did not "believe that [Mr. LoCoco] had lung cancer" until after the policy had gone into effect.  She similarly claimed in her affidavit that neither of them "had any idea" that Mr. LoCoco had lung cancer when they applied for insurance.  Finally, plaintiff testified that Mr. LoCoco believed that he only had a cold when he was first admitted to the emergency room.  These statements are consistent with the fact that doctors recommended diagnosis of his illness before the insurance effective date.

Plaintiff argues that the specific illness must be diagnosed prior to the effective date of coverage in order for it to be a pre-existing condition.   But if receipt of a recommendation to

undergo a diagnostic process[1] is sufficient to render a condition "pre-existing," as the language of the contract in this case states, it cannot be that an actual diagnostic conclusion is required. Logically, a party does not receive a diagnostic conclusion until after actually undergoing some kind of diagnostic process.

While Ohio law applies in this case, we recognize that several courts in other jurisdictions have held that where a policy defines a "pre-existing condition" as a condition "for which" treatment or care was given before the effective date, the policy is ambiguous with respect to whether a "pre-existing condition" includes a condition treated, but not yet diagnosed, before the effective date. *See Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 162-67 (3d Cir. 2002); *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411-17 (7th Cir. 1996); *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 269-70 (1st Cir. 1994); *Ross v. W. Fid. Ins. Co.*, 881 F.2d 142, 144 (5th Cir. 1989). This is because the word "for" can be read as connoting intent or purpose regarding the condition, such that *treatment* cannot be given "for" a specific condition unless the nature of the condition is known. The force of this logic does not, however, extend to the particular contractual language at issue in this case, language that unambiguously contemplates the pre-effective-date receipt of a recommendation to get a diagnosis.

Moreover, even assuming that the "for which" language permits coverage of some previously treated but not diagnosed illnesses, plaintiff points to no cases holding that a condition may be considered "pre-existing" only if it was definitely diagnosed prior to the policy date. Indeed, Ohio courts have read "pre-existing condition" clauses, albeit differently worded clauses, to require merely that there be indications of the particular condition, not that there be a definite diagnosis. In *Novak v. American Community Mutual Insurance Co.*, 718 N.E.2d 958, 963 (Ohio Ct. App. 1998), for example, the Ohio Court of Appeals interpreted a "pre-existing condition" exclusion to require "symptoms which are indicative of the condition *or* a specific diagnosis of the condition by a doctor" (emphasis added). There, that court concluded that the insured's coronary artery disease was a "pre-existing condition," even though it was not diagnosed until after the policy date, because the insured had experienced symptoms indicative of that disease, had visited a doctor for those symptoms, had been told that his risk of coronary disease was sufficiently high, and had been advised to undergo a diagnostic procedure to determine whether he in fact had that condition. *Id.*

Even in cases that dealt with clauses referring to conditions "for which" treatment was provided—but not containing the pointed "recommendation of diagnosis" language present here—courts have concluded that the ultimate condition need only have been suspected with a reasonable degree of likelihood in order to be considered "pre-existing." For instance, in *Hughes v. Boston Mutual Life Insurance Co.*, 26 F.3d at 269, the First Circuit concluded that treatment was given "for" a condition if there was "*some* awareness" on the part of the physician or insured that treatment was being given for "the condition itself" (emphasis added). Even in *Lawson v. Fortis Insurance Co.*, 301 F.3d at 166, upon which plaintiff relies heavily, the Third Circuit acknowledged that "a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms":

> When a patient seeks advice for a sickness with a specific concern in mind ( e.g., a thyroid lump, or a breast lump) or when a physician recommends treatment with a specific concern in mind ( e.g., a "likely" case of multiple sclerosis), it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested. . . . Here, there is no evidence that the possibility that Elena's

---

[1] Although the term "diagnosis" may refer to either a diagnostic procedure or a diagnostic conclusion, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 622 (2002), it clearly refers to a diagnostic procedure as used in Mr. LoCoco's policy. The policy states that "diagnosis" may be "recommended or received." It would be unnatural to read the policy as contemplating that a diagnostic result be "recommended."

condition was actually leukemia ever entered the minds of Elena's parents or Dr. Parikh. Therefore, it would not make sense to say that Dr. Parikh offered medical advice or treatment for Elena's leukemia.

*Id.* (citations omitted); *see also McLeod*, 372 F.3d at 628 ("Such a holding does not mean that we require that a 'correct' diagnosis be made before the effective date of a policy. . . .").

Thus, even under the analysis in these cases involving contractual language more generous than that in this case, pre-policy advice and recommendations were given in this case "for" lung cancer because, at the time provided, there were strong indications that Mr. LoCoco's condition was lung cancer. Mr. LoCoco was at a high risk of developing lung cancer, had experienced symptoms indicative of lung cancer, had sought medical treatment specifically for these symptoms, and had undergone a diagnostic procedure that had indicated the possible presence of lung cancer. Dr. Bhullar testified that Mr. LoCoco could have been a candidate for lung cancer "at any time" because of his pack-a-day smoking habit, and that he had previously been advised to quit. During his November 2001 doctor's appointment and his May 2002 emergency room visit, Mr. LoCoco sought medical care specifically for the symptoms which were later deemed to have resulted from his lung cancer, such as a dry cough, chest pains, and pneumonia. Furthermore, when Mr. LoCoco received medical advice in May 2002 from emergency room physicians and Dr. Bhullar, he had already had an abnormal X-ray showing a possible tumor in his lungs. This X-ray "certainly looked suggestive of a tumor in the left upper lung." Thus, this was not a situation, as plaintiff alleges, where the insurance company denied coverage using an after-the-fact analysis of only non-specific symptoms. Finally, prior to the effective date of coverage, Mr. LoCoco had been ordered to undergo diagnostic procedures to determine whether he had lung cancer. After Mr. LoCoco's abnormal X-ray, Dr. Bhullar ordered a CAT scan to determine "whether there was a mass in the lung." And, after reviewing Mr. LoCoco's abnormal CAT scan, Dr. Bhullar recommended a bronchoscopy, a procedure only performed when there are "very strong indications" of disease. Given all of these facts, it was hardly a surprise when Mr. LoCoco was given a definitive diagnosis of lung cancer.

In opposing summary judgment below, plaintiff relied upon testimony given in response to questioning about the symptoms exhibited by Mr. LoCoco prior to his emergency room visit. For example, Dr. Bhullar responded in the negative when asked whether either he or another doctor had given Mr. LoCoco treatment or advice for lung cancer prior to May 2002. Dr. Lenkey stated that there "was no suggestion that there was a preexisting condition diagnosed [during the emergency room visit]." These statements do not mean that lung cancer was not suspected at that time. Rather, they state only the undisputed proposition that Mr. LoCoco had not yet been given a diagnosis.

Likewise, plaintiff's testimony that she and Mr. LoCoco were initially unaware of his cancer, discussed above, is fully consistent with their suspecting that condition prior to the effective date of coverage. Those statements do not claim that Mr. LoCoco did not believe or suspect that he had lung cancer after being admitted to the emergency room and receiving an abnormal X-ray and CAT scan. Nor do they deny that the LoCocos suspected lung cancer between when the application was filed and when coverage began. Furthermore, even assuming that the LoCocos had not considered the possibility of lung cancer, reasonable people in their positions would have. It is undisputed that they knew that Mr. LoCoco was a heavy smoker, that smoking has health risks, that Mr. LoCoco was experiencing a dry cough, chest pains, and bleeding when coughing, that Mr. LoCoco had abnormal X-ray and CAT scans showing a "cloud" in his lungs, that emergency room physicians were "concerned," and that Mr. LoCoco had been ordered to undergo a bronchoscopy.

The conclusion is thus inescapable that Mr. LoCoco's lung cancer was a pre-existing condition under the contractual language at issue, and that he was therefore not covered for treatment of that condition for the first year of his policy.

**B.  Policy Cancellation**

Likewise, the contract permitted Medical Savings's later cancellation of the LoCocos' policy for failure to pay premiums.  Because it is undisputed that the LoCocos did not pay their January 2003 premium and because Medical Savings had no legal duty to notify them prior to cancellation for non-payment, the district court properly granted summary judgment to Medical Savings on this claim as well.

Under the terms of the LoCocos' policy, their coverage was to terminate automatically if their premiums remained unpaid for more than 31 days:

> **GRACE PERIOD**:  The *primary insured* has 31 days from each premium due date (except the first) in which to pay the premium then due.  The *primary insured*'s coverage under the *policy* will stay in force during this grace period.
>
> If premiums are not paid within this grace period, coverage under this *policy* will then be terminated . . . In any case, the *primary insured* must pay *us* all unpaid premiums, including [the] premium for the grace period.
>
> . . .
>
> ### TERMINATION OF SERVICE
>
> **For All Covered Persons:**  A covered person's insurance will automatically stop on the earlier of:
>
> (A) the date the policy is terminated;
>
> (B) the end of the grace period after a primary insured fails to pay any required premium when due.

Plaintiff does not deny that her January 2003 premium payment failed for insufficient funds, that this premium remained unpaid through the relevant grace period, or that the terms of the policy permitted automatic termination for such non-payment.  She contends, however, that Medical Savings had a duty of "fair dealing" that independently obligated it to notify the LoCocos before terminating the policy.  According to plaintiff, the LoCocos never received any form of pre-termination notification from Medical Savings.

Plaintiff's argument is without merit.  Under Ohio law, Medical Savings was not required to notify the LoCocos before canceling their policy.  Although automatic forfeiture provisions in insurance contracts are not favored, they are generally permitted.[2]  *See Ohio Farmers' Ins. Co. v. Wilson*, 71 N.E. 715, 716 (Ohio 1904); *Murphy v. N. Am. Equitable Life Assurance Co.*, 1987 WL 19482, at *2 (Ohio Ct. App. Oct. 30, 1987); *Shank v. United Life & Accident Ins. Co.*, 1981 WL 5126, at *2 (Ohio Ct. App. June 3, 1981); *Miraldi v. Life Ins. Co. of Va.*, 356 N.E.2d 1234, 1235-36 (Ohio Ct. App. 1971).  "In the absence of a statute, the cancellation of an insurance contract is governed by the contract."  *Palte v. United Ohio Ins. Co.*, 2007 WL 1731603, at *3 (Ohio Ct. App. June 18, 2007).  Following from this principle, "[a]utomatic forfeiture provisions in . . . insurance policies are enforceable if the language is clear and unambiguous."  *Murphy*, 1987 WL 19482, at *2.

---

[2]There is an explicit statutory exception to this common law rule for the cancellation of automobile insurance. Pursuant to Ohio Rev. Code §3937.32, the cancellation of automobile insurance is effective only upon written notification to the insured.

Thus, where a policy provides unambiguously that it will automatically terminate upon the occurrence of a condition, such as the non-payment of premiums, the insurer need not notify the insured before canceling coverage. *Id.*; *Shank*, 1981 WL 5126, at *2-*4.

Ohio courts do not appear to have addressed whether this common law rule applies to automatic forfeiture provisions in health insurance contracts. Nonetheless, the logic of the above cases, which primarily construed language in life insurance policies, counsels in favor of its applicability here. Because these cases based their holdings on general principles of the freedom of contract, there is no indication that Ohio courts would treat health insurance policies differently.

Here, the forfeiture clause in Mr. LoCoco's policy clearly and unambiguously provides for automatic termination upon non-payment, and is thus enforceable. The policy first states that if "premiums are not paid within [the] grace period, coverage under the *policy* will then be terminated." While this language is arguably ambiguous, the following provision removes any doubt as to whether the policy provides for automatic forfeiture. Under the heading "Termination of Services," the policy goes on to state that insurance coverage "will *automatically* stop" at "the end of the grace period after [the insured] fails to pay any required premium when due" (emphasis added).

Because Medical Savings had no duty to inform the LoCocos of its intent to cancel their policy for non-payment, it is irrelevant whether any such notice was actually given. Thus, any factual dispute as to whether Medical Savings actually sent the LoCocos a notification letter, as Medical Savings claims but the LoCocos deny, is not sufficient to preclude summary judgment.

## C. Bad Faith

Finally, Medical Savings was also entitled to summary judgment on plaintiff's claims of tortious bad faith. As both parties acknowledge, it is well-established in Ohio that an insurer must "act in good faith in the processing and payment of the claims of its insured." *Staff Builders, Inc. v. Armstrong*, 525 N.E.2d 783, 788 (Ohio 1988). In determining whether an insurer acted with the requisite good faith, a reviewing court must examine whether the insurer had "reasonable justification" for taking the challenged action. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio 1994).

Here, both the denial and subsequent cancellation of coverage were reasonably justified, and thus not done in bad faith. Plaintiff's argument that the cancellation was made in bad faith is no different from her argument that the termination was ineffective for lack of notice. As previously discussed, this claim lacks merit.

Plaintiff's contentions concerning the denial of benefits for Mr. LoCoco's cancer are similarly unavailing. She contends that the decision to deny coverage was made in bad faith because Deborah Monroe, the initial decision-maker for Medical Savings, did not have Mr. LoCoco's complete medical files when she made this decision, and was neither a lawyer nor a medical professional. Plaintiff waived consideration of this issue by failing to raise it until her reply brief. Although she mentioned Monroe's testimony in her initial "Statement of Facts," nowhere in the "Argument" section of her initial brief did plaintiff claim that Medical Savings denied Mr. LoCoco's claims in bad faith. Instead, she argued only that the decision had been made erroneously. As this court has frequently observed, "[a]n appellant waives an issue when he fails to present it in his initial briefs." *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003).

However, even assuming that the issue has not been waived, the facts viewed most favorably to plaintiff fail to establish that Medical Savings lacked a reasonable basis for denying Mr. LoCoco's claims. At the time of her September 2002 letter notifying Mr. LoCoco that his claims were being denied, Monroe had obtained Mr. LoCoco's medical records from the emergency room and Dr.

Lenkey's office. Thus, as the letter explicitly confirms, Medical Savings was aware that Mr. LoCoco was experiencing a dry cough and shortness of breath, had received abnormal X-ray and CAT scan results, and had been recommended to undergo a bronchoscopy. Medical Savings also knew from the LoCocos' insurance application that Mr. LoCoco was a smoker. Given this knowledge, Medical Savings's denial does not constitute the type of arbitrary, baseless decision-making required for a claim of bad faith.

This conclusion is not affected by the fact that Monroe lacked legal or medical training. Monroe had 33 years' experience deciding claims, had an associate's degree in "life health claims," and was certified as a "health insurance associate" by the Health Insurance Association of America. Thus, she was not unqualified, as plaintiff claims.

## III.

For the foregoing reasons, we affirm the grant of summary judgment for Medical Savings.