HOLSCHUH, District Judge,
concurring in the affirmance of the judgment.
I fully agree with Judge Clay that the Magistrate Judge’s decision should be affirmed and that Mitzel’s long-term disability benefits should be reinstated. However, I reach that conclusion for somewhat different reasons.
I. Any Error of the Magistrate Judge in Relying Solely on the Definition of a “Pre-Existing Condition” Contained in the LTD Benefit Booklet was Harmless.
The first issue on appeal is whether the Magistrate Judge erred in relying solely on the definition of a “pre-existing condition” contained in the LTD Benefit Booklet without first considering whether it conflicted with the definition contained in the LTD Benefit Program. I find that he did err but that the error was harmless.
As Judge Clay notes, the definition of a “pre-existing condition” contained in the LTD Benefit Program includes language that the LTD Benefit Booklet does not; namely, the LTD Benefit Program includes within its definition of a “pre-exist-ing condition” a sickness or injury “where symptoms were present to the degree that an ordinarily prudent person would seek treatment.” (AR 404.) To the extent that this additional language presents a potential conflict, it is irrelevant in this case, because it is undisputed that Mitzel sought and received medical treatment during the look-back period. The relevant portions of the two definitions are substantially alike. Therefore, no matter which document is consulted, the outcome remains the same, and the error was harmless.
II. The Plan Administrator Acted in an Arbitrary and Capricious Manner
A. The Plan Administrator Did Not Interpret the Plain Meaning of the Language as It Would Be Construed by an Ordinary Person.
The second, and more substantial, issue on appeal is whether the Magistrate Judge erred in finding that the Plan Administrator acted in an arbitrary and capricious manner in denying Mitzel’s claim for long-term disability benefits. Relying on Lawson v. Fortis Insurance Co., 301 F.3d 159 (3d Cir.2002) and McLeod v. Hartford Life & Accident Insurance Co., 372 F.3d 618 (3d Cir.2004), the Magistrate Judge found that the Plan’s definition of “pre-existing condition” was ambiguous. Then, applying the rule of contra proferentem and construing the ambiguity against the drafter, he concluded that Anthem’s denial of Mitzel’s claim was arbitrary and capricious. Like my colleagues, I find that the Magistrate Judge erred in applying the rule of contra proferentem. That rule simply has no application in ERISA cases subject to an arbitrary and capricious standard of review.
Nevertheless, like Judge Clay, I find that despite the error in applying this rule, the Magistrate Judge reached the right result, and Anthem did act in an arbitrary and capricious manner in denying Mitzel’s claim for benefits. In ERISA actions, the insurer has the burden of proving that an exclusion applies. See Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir.1998). I agree with Judge Clay that Anthem has not met its burden in this case.
*88 I write separately on this issue only because I am not convinced that the LTD Benefit Booklet’s definition of a “pre-exist-ing condition” is unambiguous. The LTD Benefit Booklet defines a “pre-existing condition” as a sickness or injury “for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage.” (AR at 350) (emphasis added.) As the Magistrate Judge noted, courts considering the same or similar language have reached conflicting results, leading to the conclusion that the definition is subject to more than one interpretation. (ROA at 347.)
I agree that plan administrators are given leeway in interpreting ambiguous terms in plan documents. See Moos v. Square D. Co., 72 F.3d 39, 42 (6th Cir.1995). However, that discretion is not completely unfettered. “[Fjederal courts do not sit in review of the administrator’s decisions only for the purpose of rubber stamping those decisions.” Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir.2005). Of great importance is the rule that, “[i]n interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person.” Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund, 203 F.3d 926, 934 (6th Cir.2000) (emphasis added.)
In my opinion, an ordinary person would not construe the LTD Benefit Booklet’s definition of a “pre-existing condition” to include a sickness that was neither diagnosed by the employee and the employee’s treating physicians nor its existence even suspected during the exclusionary period. The language “for which” connotes intent, and “it is hard to see how a doctor can provide treatment ‘for’ a condition without knowing what that condition is or that it even exists.” Lawson, 301 F.3d at 165. When neither the patient nor the physician even suspects a particular illness, it is patently unreasonable to find that the patient received medical care or services “for” that condition. The ordinary Anthem employee is not an attorney or a linguistician, and while the language of the preexisting condition exclusion can be parsed and debated in briefs and in courtroom oral arguments, the plan administrator is required by law to interpret this language “as it would be construed by an ordinary person.” Shelby County Health Care Corp. 203 F.3d at 934.
At oral argument, Anthem relied heavily on the case of LoCoco v. Medical Savings Insurance Co., 530 F.3d 442 (6th Cir. 2008), in urging this court to vacate the judgment below. LoCoco, however, is clearly distinguishable. In that case, during the exclusionary period, LoCoco, a smoker, was admitted to a local emergency room complaining of a cough and shortness of breath. A chest x-ray revealed a “cloud” in his left lung. The diagnosis was pneumonia, but a CAT scan was ordered because cancer was suspected. As Dr. Bhullar, who ordered the CAT scan, said, “[w]henever you see something like [pneumonia] in a smoker, you have to follow up for cancer of the lung.” Id. at 444. In addition to the CAT scan, a bronchoscopy was suggested. This procedure is ordered only when there are “very strong indications” of disease. Id. Dr. Bhullar also referred LoCoco to Dr. Lenky, “a pulmonologist who often treated patients with lung cancer.” Id.
Although LoCoco was not definitively diagnosed with lung cancer prior to his insurance policy’s effective date of coverage, the insurance company found that he had a “pre-existing condition,” i.e., lung cancer, and denied his claim. This court *89 upheld that decision. The insurance policy at issue defined a “pre-existing condition” as “... an illness ... for which medical advice, diagnosis, care, or treatment ... was recommended or received from a licensed health practitioner during the 12 months immediately preceding the effective date of coverage.” This court held as follows: “[h]ere, Mr. LoCoco had a ‘preexisting condition’ because prior to the effective date of coverage (May 29, 2002) he had an ‘illness’ for which medical ‘diagnosis’ was ‘recommended’ from a doctor, he illness, moreover, was an ailment that was suspected at the time to be, and was in fact, lung cancer.” Id. at 446. “Even though Mr. LoCoco had not received a definitive diagnosis on the effective date of coverage, diagnosis of his illness was recommended from a doctor prior to that date. Moreover, his undisputed medical history was highly suggestive of lung cancer.” Id. In LoCoco, “pre-policy advice and recommendations were given in this case ‘for’ lung cancer because, at the time provided, there were strong indications that Mr. LoCoco’s condition was lung cancer.” Id. at 448. In short, there was undisputed evidence that, during the look-back period, LoCoco’s treating physicians suspected lung cancer and had suggested tests to either confirm or rule out that particular diagnosis.
In sharp contrast to LoCoco, there was absolutely nothing in Mitzel’s medical history or her condition during the look-back period that suggested to any of her physicians the possibility that she had Wegener’s granulomatosis. Mitzel was not diagnosed with Wegener’s granulomatosis until after the effective date of coverage, and it is undisputed that, during the look-back period, Dr. Arsuaga, Mitzel’s treating physician, never even suspected that Mitzel had that disease. In fact, Dr. Arsuaga has stated:
the only abnormality noted was a rash and a borderline antinuclear antibody speckle pattern 1:80 titer. No other abnormality was noted to suggest the diagnosis of Wegener’s granulomatosis. At that time she did not meet the criteria for that diagnosis. If anything we were considering the remote possibility of systemic lupus erythematosus but she did not meet enough criteria either.
(AR 49.) At one point, Dr. Arsuaga considered referring her to an ear-nose-throat surgeon for a biopsy to confirm a possible diagnosis of lupus (AR 139.) Clearly, an ordinary person would not find that Dr. Arsuaga provided Mitzel with medical care or services “for” Wegener’s granulomato-sis during the three months prior to her effective date of coverage.
The critical distinction between the two cases is that whereas LoCoco clearly involved “a suspected condition without a confirmatory diagnosis,” the present case clearly involves “a misdiagnosis or an unsuspected condition manifesting non-specific symptoms.” LoCoco, 530 F.3d at 448 (quoting Lawson, 301 F.3d at 166).[1]
In considering Mitzel’s claim for benefits, Anthem employed physicians who simply reviewed Mitzel’s medical records and gave opinions, in hindsight, that some of the symptoms which Dr. Arsuaga believed were symptoms of lupus were also consistent with the unsuspected diagnosis of Wegener’s granulomatosis. Based on *90 these opinions, and without even acknowledging the opinions of Mitzel’s treating physicians, Anthem determined that Mitzel had received medical care or services “for” Wegener’s granulomatosis during the look-back period, and that the pre-existing condition exclusion therefore applied.
Courts have rightly expressed concern with this type of “after-the-fact analysis of only nonspecific symptoms.” LoCoco, 530 F.3d at 448. In Lawson, the Third Circuit noted as follows:
[Considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. “To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.” In re Estate of Monica Ermenc, 585 N.W.2d [679] at 682 [(Wis.App.1998)].
Lawson, 301 F.3d at 166. See also McLeod, 372 F.3d at 625 (“The problem with using this type of ex post facto analysis is that a whole host of symptoms occurring before a ‘correct’ diagnosis is rendered, or even suspected, can presumably be tied to the condition once it has been diagnosed. Thus, any time a policy holder seeks medical care of any kind during the look-back period, the ‘symptom’ that prompted him to seek the care could potentially be deemed a symptom of a preexisting condition, as long as it was later deemed consistent with symptoms generally associated with the condition eventually diagnosed.”). I agree with these concerns. Not only is this “after-the-fact” analysis absolutely contrary to how an ordinary person would construe the Plan’s definition of a “pre-existing condition,” but it is also inconsistent with the purpose of ERISA. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (noting that Congress enacted ERISA “to promote the interest of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.”).
B. The Plan Administrator also Ignored a Basic Principle of Contract Law.
I also find that the Plan Administrator’s interpretation of the language “for which you received medical care or services” is contrary to a basic principle of contract law. Group benefit plans governed by ERISA are interpreted by the federal courts using “ ‘general rules’ of contract law as part of the federal common law.” Cassidy v. Akzo Nobel Salt, Inc., 308 F.3d 613, 615 (6th Cir.2002). Under federal common law, “ERISA plans, like contracts, are to be construed as a whole.” Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 93 (3d Cir.1992); Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1250 (10th Cir.2007).
Even if the “for which” language in the LTD Benefit Booklet, standing alone, is considered ambiguous, there is another explanation of a pre-existing condition in the plan documents that does not contain the words “for which.” Article 7 of the “Anthem Flexible Benefits Plan and Summary Plan Description” reads as follows:
Article 7: Circumstances Which May Affect Benefits
Your benefits and the benefits of your eligible family members will cease when your participation in the Plan terminates. See Article 4 above.
*91 Your benefits will also cease upon termination of the Plan.
Other circumstances can result in termination, reduction, or denial of benefits. For example, benefits may be denied under the medical Benefit Program if you, ham a, preexisting condition and incur costs for treatment of that condition within the exclusionary period. Please consult the applicable summary plan description, which is available on the HR intranet site, for additional information.
(ROA 146) (emphasis added.)[2]
The example requires that costs must be incurred by the employee for “treatment of that condition” within the exclusionary period before there can be a denial of benefits. The ordinary person could easily understand that if the employee spends money for treatment of a known condition during the exclusionary period, and it later is discovered by the Plan Administrator that this particular condition existed before the effective date of the coverage, the employee will be denied coverage. On the other hand, if, for example, a jaundiced employee suffering from abdominal pain is diagnosed during the look-back period with gallstones and later dies of pancreatic cancer after the effective date of coverage, would the ordinary employee believe that, because jaundice is a symptom of both conditions, the employee received treatment for pancreatic cancer during the look-back period? I think not. In such a case, the employee did not incur costs for the “treatment of that condition,” i.e., pancreatic cancer, during the exclusionary period.[3]
Article 7, therefore, clarifies any ambiguity that exists with respect to the definition at issue. See Lake v. Metropolitan Life Ins. Co., 73 F.3d 1372, 1379 (6th Cir. 1996) (finding that ambiguous language in one portion of an ERISA plan was resolved by reference to the clear and unambiguous language in another portion of the plan).
III. Conclusion
For the reasons stated, under the circumstances presented here, the Plan Administrator interpreted the language in a manner that was not only contrary to the interpretation required by the law in this Circuit, i. e. “as it would be construed by an ordinary person,” but also contrary to the federal common law requiring that all provisions of a plan must be construed as a whole. The Plan Administrator’s interpretation, therefore, was arbitrary and capricious, and the judgment of the district court should be affirmed.

. In the former case it is not unreasonable to deny benefits when a person is treated for a suspected sickness during the look-back period and it is later confirmed by a definitive diagnosis. It is totally unreasonable, however, in the latter case to deny benefits when a person is misdiagnosed and is treated for an entirely different sickness during the look-back period. No ordinary person would find that to be a reasonable interpretation of the Plan's definition of a pre-existing condition.

. While the example refers to the Medical Benefit Program, that program, like the Long Term Disability Benefit Program, is one of seven component benefit programs. See Article 2 of the Anthem Flexible Benefits Plan and Summary Plan Description. Since the Plan must be construed as a whole, there is no reason why this example should not also apply to the Long Term Disability Benefit Program.

. Jaundice can be a symptom of pancreatic cancer as well as gallstones. WebMD, Pancreatic Cancer Symptoms, at http://www. webmd.com/cancer/ pancreatic-cancer/pancreatic-cancer-symptoms (last reviewed by Louise Chang, MD Mar. 4, 2009); WebMD, Gallstones-Symptoms, at http://www.webmd. com/digestive-disorders/tc/gallstones-symptoms (last updated Aug. 2, 2007).