**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0717n.06

**No. 08-4033**

**FILED**
**Nov 04, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

RUTH A. MITZEL,

     **Plaintiff-Appellee,**

v.

     **ON APPEAL FROM THE UNITED
     STATES DISTRICT COURT FOR THE**
ANTHEM LIFE INSURANCE CO., et al.,      **NORTHERN DISTRICT OF OHIO**

     **Defendants-Appellants.**

_____/

**BEFORE:**    **CLAY and McKEAGUE, Circuit Judges; and HOLSCHUH, District Judge.**[*]

     **CLAY, Circuit Judge.**   Defendants Anthem Life Insurance Company ("Anthem"),

Wellpoint, Inc. ("Wellpoint") and Wellpoint Flexible Benefit Plan appeal the district court's order

reversing Defendants' denial of long-term disability benefits for Plaintiff Ruth Mitzel ("Mitzel").

Mitzel brought this enforcement action pursuant to the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, after the health plan administrator denied her claim

for long-term disability benefits. On appeal, Defendants argue that the district court erred in finding

that the administrator's decision had been arbitrary and capricious. For the following reasons, we

**AFFIRM** the order of the magistrate judge.

**BACKGROUND**

_____

     [*]The Honorable John D. Holschuh, United States District Judge for the Southern District of
Ohio, sitting by designation.

## I.

## A.

On March 15, 2004, Mitzel began working for Anthem, a subsidiary of Wellpoint, and joined Wellpoint's Flexible Benefit Plan (the "Plan"). Anthem was the Plan's administrator, with discretionary authority to interpret the Plan and final authority in reviewing claims and appeals.

The terms and conditions of Mitzel's long-term disability benefits under the Plan are contained in three separate documents. The first document, titled "Anthem Flexible Benefits Plan and Summary Plan Description" (the "Summary Plan Description") provides a general, condensed guide to Wellpoint employees' health benefits and coverage. The first page of the Summary Plan Description states: "This document, together with the incorporated documents listed in Exhibit C, constitute the written plan document required by Section 402 of ERISA and the Summary Plan Descriptions required by Section 102 of ERISA." (Administrative Record ("AR") at 358.) Exhibit C of the Summary Plan Description is a list of the Plan's eight component benefit programs, including the Long Term Disability Benefit Program (the "LTD Benefit Program"). A one-sentence preface to this list of programs states: "Component Benefit Programs are available on the HR intranet site unless otherwise noted." (AR at 387.) The LTD Benefit Program is a separate thirty-five page document which describes the conditions for long-term disability benefits as follows:

> We will cover your disability if it is caused by, contributed to by or results from a pre-existing condition and your disability begins after you have been insured for 12 consecutive months after the effective date of coverage. If you do not meet this time period requirement, your disability is excluded from coverage under this plan.
>
> *Pre-existing condition is a sickness or injury:*
> *for which you received treatment;*
> *OR*

*where symptoms were present to the degree that an ordinarily prudent person would seek treatment;*
*within the three months prior to your effective date of coverage.*

*Treatment includes:*
*consulting with a doctor*
*receiving care or services from a doctor or from other medical professionals a doctor recommends you see*
*taking prescribed medicines*
*being prescribed medicines*
*you should have been taking prescribed medicines but chose not to receiving diagnostic measures.*

(AR at 404-05) (formatting in original, with bullets omitted). The LTD Benefit Program defines "effective date of coverage" as ninety days after the employee has begun active employment, or June 13, 2004 in Mitzel's case. (AR at 392.)

A third relevant document, entitled "Long-Term Disability: 2005 Benefit Booklet" (the "LTD Benefit Booklet") and consisting of eleven pages, was also available for Plan participants. The LTD Benefit Booklet includes a preface that states "Together with the Anthem Flexible Benefits Plan and Summary Plan Description, this document constitutes the written plan document required by Section 402 of ERISA and the Summary Plan Description required by Section 102 of ERISA." (AR at 348.) The LTD Benefit Booklet includes a section on pre-existing conditions which states:

> During your first 12 months of coverage, you will not be eligible to receive disability benefits if your disability is caused by, contributed to by or results from a pre-existing condition. A pre-existing condition is a sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage.

(AR at 350.) The last page of the LTD Benefit Booklet includes the following disclaimer: "In case of any conflict between this booklet and the Plan document, the provisions of the actual Plan

document will prevail. It is your responsibility to read, understand and comply with the policies described in this Summary Plan Description (SPD)." (AR at 357.)

**B.**

In January 2004, during an annual physical with her primary care physician, Mitzel reported that she was experiencing hip pain. Her physician referred her to Dr. Rafael E. Arsuaga ("Dr. Arsuaga"), who met with Mitzel on March 2, 2004. Following this visit, Dr. Arsuaga wrote to Mitzel's primary care physician that Mitzel "presents with acute onset of symptoms dating October of 2003 when initially she experienced right shoulder pain followed by right lateral shoulder pain and neck pain, low back pain, left hip pain and generalized malaise lasting several hours despite the use of NSAIDs in the past." (AR at 137.) Dr. Arsuaga also stated that "positive antinuclear antibody speckled pattern, young female with arthralgias might suggest the possibility of SLE [Systemic Lupus Erythematosis] but I would expect to see much more criteria before we could assure the diagnosis. Other possibilities to consider in the differential diagnoses are rheumatoid arthritis, acute thyroiditis." (AR at 138.) Mitzel met with Dr. Arsuaga again on March 25, 2004 and April 2, 2004, displaying a rash on her arms and thighs for the first time. After the March 25, 2004 visit, Dr. Arsuaga took a note that he was now "consider[ing] more strongly the possibility of SLE," and recommended to Mitzel after the April 2, 2004 visit that if her symptoms persisted, she should see an ear-nose-and-throat surgeon for a biopsy. (AR at 139.) Dr. Arsuaga continued to suspect SLE and recommended a biopsy after meeting with Mitzel again on May 6, 2004.

Upon receiving Dr. Arsuaga's reports assessing Mitzel and seeing no improvement, Mitzel's primary care physician then referred her to the Cleveland Clinic. On June 18, 2004–five days after

her effective date of coverage under the Plan–the Cleveland Clinic diagnosed Mitzel for the first time with Wegener's granulomatosis ("WG"), a life-threatening condition affecting multiple organs.

On June 3, 2005, Mitzel was hospitalized as her WG deteriorated, and accordingly took short-term disability leave from work. On November 1, 2005, with her short-term disability benefits exhausted, Mitzel submitted a claim for long-term disability benefits. By letter dated May 18, 2006, Anthem denied Mitzel's claim. In the letter, Anthem cited the definition of "pre-existing condition" in the LTD Benefit Booklet, and noted Mitzel's three visits with Dr. Arsuaga during the three-month look-back period of March 13 to June 13, 2004. Although Dr. Arsuaga had never considered the possibility that Mitzel had WG, Anthem nevertheless advised Mitzel that "[a]s you were having symptoms of your condition and consulted with Dr. Arsuaga during the pre-existing time frame, your condition qualifies as pre-existing and is excluded from coverage under the plan." (AR at 114.)

On June 8, 2006, Mitzel appealed the Plan's denial of long-term disability. In reviewing Mitzel's appeal, Anthem retained an "independent physician specialist," Ronald J. Bloomfield, to evaluate Mitzel's medical history and claim. (AR at 83.) Dr. Bloomfield concluded:

> Ms. Mitzel became ill in October 2003 with [WG]. She had multiple medical visits prior to, during, and after her pre-existing time period. She was being examined by Dr. Arsuaga in March and May 2004 for symptoms which were eventually diagnosed as [WG]. She became symptomatic from [WG] in October 2003 and was not diagnosed nor treated until June 2004. The failure to make the diagnosis until a few days after her pre-existing time period ended is noted. However, she was being examined by Dr. Arsuaga for symptoms which were caused by [WG]. . . . The fact that the diagnosis was not confirmed until after she was hospitalized in June 2004 does not change the fact she was in the midst of an evaluation prior to her becoming so ill that she required a lengthy hospitalization.

(AR at 93.) Based on Dr. Bloomfield's assessment, the Plan upheld the denial of Mitzel's long-term disability benefits.

Mitzel made a final appeal to Anthem, submitting letters from Dr. Arsuaga and the shoulder specialist who first evaluated her shoulder pain in October 2003. Dr. Arsuaga stated in his letter that when he evaluated Mitzel in March and May 2004, Mitzel did not meet the criteria for WG. The shoulder specialist stated, "Her problem at that time was for an acute shoulder impingement tendonitis, which improved by her last visit with me on 12/4/03. Her problem of shoulder impingement tendonitis is not a pre-existing condition to her current diagnosis of [WG]." (AR at 50.) Anthem hired another independent physician to assess Mitzel's claim based on her medical records. The independent physician confirmed Dr. Bloomfield's opinion, and by letter dated February 1, 2007, the Plan Administrator denied Mitzel's final appeal for the same reasons it previously stated.

## C.

On July 3, 2007, Mitzel filed this ERISA enforcement action against Anthem and Wellpoint in district court, later amending her complaint to add Wellpoint Flexible Benefit Plan as a third Defendant. On October 23, 2007, the parties consented to the jurisdiction of a magistrate judge with respect to all issues, including dispositive rulings. On February 15, 2008, Defendants moved the court to uphold the denial of benefits, and Mitzel cross-moved for summary judgment in her favor.

On July 14, 2008, the magistrate judge granted Mitzel's motion for summary judgment and overruled the administrator's denial of Mitzel's long-term disability benefits, because he found Defendants' interpretation of "pre-existing condition" in the Plan to be arbitrary and capricious. Noting that the Plan's definitions of "pre-existing condition" in the LTD Benefit Program and the LTD Benefit Booklet were different, the magistrate judge stated that "[t]he court rests the decision

on the definition in the [LTD Benefit Booklet], which had been quoted in the initial denial letter. Plan summaries generally trump the language of the plans themselves." (Record on Appeal at 340.) The court then found that the definition of "pre-existing condition" in the LTD Benefit Booklet was ambiguous with respect to whether it applied to a condition for which symptoms were recognized during the look-back period, but for which there had not been an accurate diagnosis or even a suspicion of the actual condition. The court then applied the rule of *contra proferentem*–that ambiguities must be construed against the drafter of the ambiguous language–to find that the denial of benefits based on this language was arbitrary and capricious. Defendants timely appealed.

## II.

This Court reviews *de novo* a district court's decision to grant summary judgment upholding or reversing a denial of health benefits pursuant to ERISA. *Killian v. Healthsource Provident Adm'rs Inc.*, 152 F.3d 514, 520 (6th Cir. 1998).

When an ERISA plan grants the plan administrator discretionary authority to determine benefit eligibility, the district court must review the plan administrator's decision under the arbitrary-or-capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003). In this case, the Plan states that Anthem has "the full power to make factual determinations and to interpret and apply the terms of the Plan as they relate to the benefits provided through this self-funded Plan." (AR at 379.) The parties do not dispute that the Plan grants discretionary authority to the Plan's administrator, and that the arbitrary-or-capricious standard should therefore apply.

"This [arbitrary and capricious] standard is the least demanding form of judicial review of administrative action. . . .When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Killian*, 152 F.3d at 520. Under this standard, this Court "will uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)), *aff'd*, 128 S. Ct. 2343 (2008). Yet while arbitrary and capricious review is deferential, it "is no mere formality[,]" and must consider "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Glenn*, 461 F.3d at 666 (quotations and citation omitted). "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

Moreover, this Court may consider, as "a factor . . . when determining whether the administrator's decision to deny benefits was arbitrary and capricious," the conflict of interest that exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). In considering this factor, "[t]he reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Id.* (citations omitted). Through its Anthem subsidiary, Wellpoint both funds and administers the Plan, and therefore acts under this conflict of interest. However, Mitzel does not argue before this Court that the conflict influenced the denial of her

disability benefits, and has provided no evidence of bias. Accordingly, we place little emphasis on this factor, though we note that where an insurer funds and administers a plan, "there is an actual, readily apparent conflict . . . not a mere potential for one." *Killian*, 152 F.3d at 521.

"[A]bsent a procedural challenge to the plan administrator's decision, this Court's review is limited to the administrative record of the benefit determination." *Evans*, 434 F.3d at 876.

## III.

The magistrate judge, in determining whether Anthem's interpretation of "pre-existing condition" was arbitrary and capricious, considered only the definition in the LTD Benefit Booklet, because "[p]lan summaries generally trump the language of the plans themselves." (ROA at 340.) On appeal, Defendants argue that the magistrate judge impermissibly ignored the Plan's other documents in focusing exclusively on the LTD Benefit Booklet.

ERISA requires a plan provider to distribute a summary plan description to all participants and beneficiaries. 29 U.S.C. § 1021(a)(1). The summary plan description must "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." § 1022(a). Defendants have not disputed that the relevant "summary" document for the purposes of § 1021(a)(1) is the LTD Benefit Booklet.[1]

---

[1]We note that the Plan documents themselves are far from clear as to which one is the summary document. The LTD Benefit Booklet contains a disclaimer that it is the summary document with respect to long-term disability benefits. However, the Summary Plan Description also states that it and the component programs listed in Exhibit C constitute *both* the Plan and the summary document. Compounding the confusion is the fact that both the Summary Plan Description and the LTD Benefit Booklet refer to themselves as the "Summary Plan Description" in some places. We fail to understand how these overlapping documents, each purporting to constitute a "summary"

"This Circuit has decided that statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988); *Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 564 (6th Cir. 2007). This rule is premised on the rationale that "[i]t is grossly unfair to hold an employee accountable for acts which disqualify him from benefits if he had no knowledge of these acts or if these conditions were stated in a misleading or incomprehensible manner in the plan booklets." *Edwards*, 851 F.2d at 136 (quotations and citation omitted). Thus, "[i]t is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan." *Id.* (quotations and citation omitted).

However, "[a]n omission from the summary plan description does not, by negative implication, alter the terms of the plan itself. The reason is obvious: by definition, a summary will not include every detail of the thing it summarizes." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) (en banc) (citations omitted). Further, "under the law of this circuit, language in a plan summary that is merely ambiguous should not be permitted to trump unambiguous language in the plan itself[.]" *Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 938 (6th Cir. 1996); *see also Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996) (resolving ambiguity in summary plan description by referring to clarifying language in plan documents). Thus, while a conflict exists where the summary plan description misleads or fails to state additional requirements

---

of the Plan, could possibly fulfill the mandate in § 1021(a)(1) to provide a clear, concise summary for Plan participants.

contained in the plan document, *see Edward*s, 851 F.2d at 136, there is no conflict where the plan document merely clarifies the summary's general language, *see Foltice*, 98 F.3d at 938.

The LTD Benefit Booklet provides notice that to the extent that any conflict exists between its terms and the primary Plan documents, the primary Plan documents control. However, as this Court stated in *Edwards*, ERISA does not allow plan providers to short-cut their obligations to provide clear, comprehensive summary plan descriptions by including a conclusory warning in the summary that the more detailed plan document controls in case of conflict. Thus, regardless of the Plan's disclaimers, to the extent that the provisions in the LTD Benefit Program contradict the LTD Benefit Booklet and mislead a Plan member, this Court must favor the terms in the LTD Benefit Booklet.

The LTD Benefit Booklet states that "[a] pre-existing condition is a sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage." (AR at 350.) The LTD Benefit Program defines "pre-existing condition" as "a sickness or injury for which you received treatment OR where symptoms were present to the degree that an ordinarily prudent person would seek treatment" during the three-month look-back period. (AR at 404.) The second part of the LTD Benefit Program's definition, which focuses on whether symptoms of the disability were present during the look-back period, departs from the definition in the LTD Benefit Booklet. The LTD Benefit Booklet requires an employee to have received "medical care or services" for the disability, whereas the LTD Benefit Program could enable an employee to have a pre-existing condition even if the employee did not seek or receive any medical attention, but merely exhibited symptoms of a

11

disease for which treatment begins after the effective date of coverage. We believe this distinction in the definitions is misleading, because nothing in the LTD Benefit Booklet would indicate that a doctor's identification of symptoms of a subsequently diagnosed illness during the look-back period, by itself, could satisfy the definition of a pre-existing condition. Accordingly, we will not countenance the part of the LTD Benefit Program's definition that refers to symptoms.[2] However, because the remainder of the definition in the LTD Benefit Program appears to be a consistent elaboration of the definition in the LTD Benefit Booklet, this Court may consult it to the extent it clarifies any ambiguities in the LTD Benefit Booklet. *See Foltice*, 98 F.3d at 938.

**IV.**

Focusing on the definition of "pre-existing condition" in the LTD Benefit Booklet, the magistrate judge found ambiguity with respect to whether Mitzel's treatment for the symptoms of WG during the three-month look-back period qualified her WG as a "pre-existing condition." The magistrate judge then ruled for Mitzel by resolving the ambiguity against the Plan's drafter pursuant to the doctrine of *contra proferentem*.

As an initial matter, we are troubled by the magistrate judge's reliance on the rule of *contra proferentem* in this case. To be sure, this Court has invoked the rule in previous ERISA disputes, holding that "to the extent that the Plan's language is susceptible of more than one interpretation, we will . . . construe any ambiguities against . . . the drafting parties." *Univ. Hosps.* of *Cleveland*

---

[2] Without commenting on this analysis or on the inconsistencies between the LTD Benefit Booklet and the LTD Benefit Program, the dissent refers to the "ordinarily prudent person" language. Not only is this reference misplaced for the reasons stated, but our analysis would remain unchanged since Mitzel did seek treatment for her symptoms in any case.

*v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998) (en banc); *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 n.1 (6th Cir. 2002).

However, in cases such as this one, in which the administrator's denial of benefits is reviewed under the arbitrary and capricious standard because of the discretion conferred by the Plan, we believe that invoking the rule of *contra proferentem* undermines the arbitrary and capricious standard of review. Under the arbitrary and capricious standard, courts must *favor* a plan administrator's interpretation over an equally reasonable contrary interpretation. *See, e.g., Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) ("We must accept a plan administrator's rational interpretation of a plan *even in the face of an equally rational interpretation offered by the participants*.") (emphasis added). Moreover, although this Court appears to have applied the *contra proferentem* doctrine when reviewing under the arbitrary and capricious standard, *see University Hospitals*, 202 F.3d at 850, several circuits have held that the rule of *contra proferentem* does not apply where a plan bestows interpretative authority on its administrator. *See Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 554 (9th Cir. 1995) ("We hold that the rule of *contra proferentem* is not applicable to self-funded ERISA plans that bestow explicit discretionary authority upon an administrator to determine eligibility for benefits or to construe the terms of the plan."); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443 (2d Cir. 1995) ("[A]pplication of the rule of *contra proferentem* is limited to those occasions in which this Court reviews an ERISA plan *de novo*."); *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir. 1994) (noting, after citing cases from seven other circuits that invoked *contra proferentem* rule in ERISA context, that "all of the

cited cases except [one] involve a *de novo* review of the challenged insurance plan"). Limiting the application of the *contra proferentem* rule to cases in which an administrator's decision is reviewed *de novo* strikes us as the only sensible approach to resolving ambiguities in plan documents.

Regardless, the language of the LTD Benefit Booklet is unambiguous in supporting Mitzel's argument that she did not have a pre-existing condition. "In interpreting a plan, the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person." *Morgan*, 385 F.3d at 992. "In applying the 'plain meaning' analysis, we must give effect to the unambiguous terms of an ERISA plan." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000) (quotations and citations omitted).

The LTD Benefit Booklet states that a pre-existing condition is "a sickness or injury *for which* [Mitzel] received medical care or services." (AR at 350.) (emphasis added). Although both documents go on to list some of the actions that would qualify as "treatment" or "medical care or services," both constructions require the medical attention to be *for* the pre-existing condition. The Third Circuit, interpreting a similar "pre-existing condition" definition in a health care plan in the context of a contractual dispute, provided an analysis of the word "for" that this Court finds persuasive:

> The word "for" connotes intent. Webster's Dictionary states that "for" is "used as a function word to indicate purpose." Webster's Ninth New Collegiate Dictionary 481 (1986). Black's Law Dictionary similarly states that the word "connotes the end with reference to which anything is, acts, serves, or is done. In consideration of which, in view of which, or with reference to which, anything is done or takes place." Black's Law Dictionary 579-80 (5th ed. 1979). . . . In short, it is hard to see how a doctor can provide treatment "for" a condition without knowing what that condition is or that it even exists.

*Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 165 (3d Cir. 2002); *see also McLeod v.*

*Hartford Life and Accident Ins. Co.*, 372 F.3d 618, 626 (3d Cir. 2004) ("Finding the *Lawson* analysis

persuasive, we construe the term 'for' to contain the *Lawson* element of intentionality [in the ERISA

context].").[3] This Court has also previously opined in *dicta* that "the word 'for' can be read as

connoting intent or purpose regarding the condition, such that treatment cannot be given 'for' a

specific condition unless the nature of the condition is known." *LoCoco v. Medical Sav. Ins. Co.*,

530 F.3d 442, 447 (6th Cir. 2008). We further noted in *LoCoco* that "in [ERISA] cases that dealt

with clauses referring to conditions 'for which' treatment was provided . . . courts have concluded

that the ultimate condition need only have been *suspected with a reasonable degree of likelihood* in

order to be considered 'pre-existing.'" *Id.* at 447-48 (emphasis added).[4]

---

[3] The dissent attempts to cite a dictionary as well for a definition of "for." Its definition, meaning "because of," is definition 8(a) in Webster's Third New International Dictionary, Unabridged (2002). Counting subsections, Webster's lists twenty different definitions before the one relied on by the dissent. Furthermore, the example in the dictionary for the definition "because of" is "shouted for joy," which is not at all how the term is used in the Plan. The same dictionary's definition 3(c)(2) is "on the point of: having the intention of." The dictionary's example is "was just for going to bed." The language in the Plan more closely parallels the usage in this definition. The dissent's use of "because of" as the appropriate definition of "for" is not at all the "plain meaning of [the Plan's] language as it would be construed by an ordinary person." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004).

[4] The dissent attempts to extend *LoCoco* far beyond what it actually holds. Judge McKeague cites *LoCoco* following his assertion that "a patient can have diagnostic tests for a sickness even though neither the patient nor the doctor suspected or correctly diagnosed the sickness at the time." Dissent at 4. *LoCoco* dealt with a patient who was suspected of having lung cancer but who had not been officially diagnosed prior to coverage. It cites numerous cases where courts have emphasized that testing for a suspected but undiagnosed illness satisfy similar "for which" language. 530 F.3d at 447-48. Nothing in the case states that treatment for symptoms of an unknown illness are sufficient to satisfy "for which" language. If Mitzel's doctors had strongly suspected WG but had not received the results of diagnostic testing before coverage began, this would be a different case.

The dissent quibbles with our use of the Third Circuit precedent, arguing without support from any case that, "the types of medical care or treatment specified by the Plan [do not] require that the doctor or the patient correctly diagnose or even suspect during the pre-existing period the actual sickness that is ultimately diagnosed." Dissent at 3. The dissent continues to boldly assert how clear the Plan language is but supports its argument only with a dictionary definition of "sickness" and the aforementioned misleading dictionary definition of "for." It relies on no additional language of the Plan and no case law. This lack of support is not surprising because the statement that a preexisting condition is "a sickness or injury for which you received treatment" in no way unambiguously encompasses treatments for symptoms of an undiagnosed illness. Given the dissent's lack of cited authority, it appears no court in this country has read a similar clause the way that Judge McKeague finds is so clear. The much more logical reading is that the Plan requires some knowledge of what the sickness is in order to provide treatment *for* the sickness.

In denying Mitzel's long-term disability claim, the only reference Anthem made to Mitzel receiving treatment was that Mitzel "consulted with Dr. Arsuaga" while displaying some of the symptoms of WG. (AR at 114.) However, Dr. Arsuaga stated that when he evaluated Mitzel during the look-back period, Mitzel did not meet the criteria for WG. Furthermore, nothing in the administrative record indicates that Dr. Arsuaga had even an inkling that Mitzel might have WG, let alone "suspected [WG] with a reasonable degree of likelihood," *see LoCoco*, 530 F.3d at 447-48. Because none of Mitzel's physicians even considered the possibility that she had WG before her effective date of coverage, none of them treated her *for* WG, notwithstanding the fact that she displayed some of the symptoms of that disease. It was unreasonable for Anthem to deny Mitzel's

claim simply because she presented symptoms associated with a later-diagnosed disease and consulted with a doctor during the look-back period in connection with those symptoms, where the doctor did not suspect, diagnose or treat the specific disability for which she eventually applied for benefits.[5]

Our reading of "pre-existing condition" in the LTD Benefit Booklet is supported by the part of the definition in LTD Benefit Program that we are free to consult. To reiterate, we find the entire explanation of "pre-existing condition" in the LTD Benefit Program consistent with the definition in the LTD Benefit Booklet, except for the phrase "a sickness or injury where symptoms were present to the degree that an ordinarily prudent person would seek treatment." The non-conflicting part of the LTD Benefit Program's definition states that a pre-existing condition is "a sickness or injury *for which* [Mitzel] received treatment." (AR at 404) (emphasis added). The LTD Benefit Program lists a number of examples of "treatment," but notably, does not includes medical attention for symptoms of a disease that is later diagnosed.

Because neither the definition of "pre-existing condition" in the LTD Benefit Booklet nor the elaboration of the definition of "treatment" in the LTD Benefit Program includes a doctor's consideration of symptoms which he was unable to connect to a subsequently diagnosed disease, Anthem's denial of benefits based on this language was arbitrary and capricious. Accordingly, the

---

[5] Judge McKeague's emphasis on the definition of "sickness" is somewhat confusing. Whether "sickness" standing alone requires a diagnosis is irrelevant where the Plan unambiguously requires that the treatment be *for* the sickness. In this case, the sickness is WG, and Mitzel received no treatment *for* WG during the look-back period when the treating physician had no idea that she suffered from that "sickness."

17

district court was correct to reverse Anthem's decision, even if resort to the rule of *contra proferentem* may not have been appropriate.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

No. 08-4033

**McKEAGUE, Circuit Judge, dissenting.** Although we review the plan administrator's decision under the arbitrary and capricious standard, I also would "adhere to the plain meaning of [the Plan's] language as it would be construed by an ordinary person," *Morgan v. SFK USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004), and give "effect to the unambiguous terms of an ERISA plan." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000) (citations omitted). However, unlike the majority, I believe that the language in the LTD Benefit Booklet and the LTD Benefit Program unambiguously supports plan administrator Anthem's decision to deny plaintiff-appellee Ruth Mitzel long-term disability benefits. Consequently, I would reverse the district court.

During the first twelve months of coverage, the long-term disability plan ("the Plan") provides a look-back period for the three months preceding the Plan's effective date of coverage. If a pre-existing condition (a condition arising during this look-back period) is found, then participants are not eligible for disability benefits. Thus, the definition of pre-existing condition is central to this case. The LTD Benefit Booklet defines a pre-existing condition as, "a sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage." (AR 350.) The LTD Benefit Program further states that a "[p]re-existing condition is a sickness or injury: for which you received treatment; OR where symptoms were present to the degree that an ordinarily prudent person would seek treatment." (AR 404) (emphasis removed and formatting changed from the original). The LTD Benefit Program defines "treatment" to "includ[e]": "[1] consulting with a doctor [2] receiving care or services from a doctor or from other medical professionals a doctor recommends you see . . . [3]

19

receiving diagnostic measures." (AR 404-405) (emphasis removed and formatting changed from the original).

The difficulty in this case arises because Mitzel developed symptoms of Wegener's granulomatosis ("WG") in 2003. The effective date of her long-term disability coverage was June 13, 2004, so the look-back period ran from March 13, 2004 to June 13, 2004. Mitzel was hospitalized on June 3, 2004, but not diagnosed with WG until June 18, 2004, five days after her effective date of coverage. In deciding whether her claim was for a pre-existing condition, Anthem relied on the expert analysis of Dr. Ronald J. Bloomfield. Dr. Bloomfield found that Mitzel had WG before October 2003, showed the symptoms of WG by October 2003, and had medical visits to investigate the symptoms of WG during the look-back period. Furthermore, Mitzel received repeated diagnostic tests and diagnostic measures during the pre-existing period for the condition later determined to be WG and its symptoms. (AR 36).

In analyzing the applicable language in the LTD Benefit Booklet, the majority focuses on the "for which" language, building off earlier decisions in the Third Circuit. *See Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 165 (3d Cir. 2002); *McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 625-26 (3d Cir. 2004) (relying on *Lawson*). The *Lawson* and *McLeod* courts adopted a definition of "for" that "connotes intent" or is "'used as a function word to indicate purpose.'" *Lawson*, 301 F.3d at 165 (citing Webster's Ninth New Collegiate Dictionary 481 (1986)). These Third Circuit opinions then interpreted this language to require that the medical care provided must have been intended to treat the claimant's diagnosed or suspected sickness. Put another way, the Third Circuit interpreted the "for which" language to require that the doctor or the patient diagnosed

or suspected during the pre-existing period that the patient had the specific sickness that the patient was ultimately diagnosed with and that treatment was intended for that specific diagnosed or suspected sickness.

However, neither the definition of sickness nor the types of medical care or treatment specified by the Plan require that the doctor or the patient correctly diagnose or even suspect during the pre-existing period the actual sickness that is ultimately diagnosed. First, as stated in the Plan's language, the medical care is not provided "for" a diagnosed or suspected sickness, it is simply provided for a "sickness," without any initial modifiers. The definition of sickness is broad:

> *1 a* : the condition of being ill : ill health : illness *b* : a disordered, weakened, or unsound condition
> *2* : a form of disease : malady

*Webster's Third New International Dictionary, Unabridged* (2002) *available at* http://unabridged.merriam-webster.com (1 Oct. 2009). A sick person has the condition of being ill, a form of disease, ill health, or a weakened, disordered, or unsound condition even if neither the doctor nor the patient diagnosed or suspected the actual sickness that the patient was ultimately diagnosed with. In this case, there is no dispute that Mitzel was sick with WG during the pre-existing period, even though neither she nor her doctors diagnosed or suspected that she had WG during the pre-existing period.

Furthermore, the remaining language in the Plan confirms that the Plan does not require that the sickness be diagnosed or suspected by the doctor or the patient during the pre-existing period. The LTD Benefit Booklet defines pre-existing condition to include "a sickness . . . for which you received medical care or services (doctor visits, prescriptions and diagnostic tests)." A patient can

21

have doctors visits for a sickness, even though neither the patient nor the doctor correctly diagnosed or suspected the sickness at the time. Moreover, a patient can have diagnostic tests for a sickness, even though neither the patient nor the doctor suspected or correctly diagnosed the sickness at the time. *See LoCoco v. Medical Savings Ins. Co.*, 530 F.3d 442, 447 (6th Cir. 2006) ("Logically, a party does not receive a diagnostic conclusion until after actually undergoing some kind of diagnostic process."). Similarly, the LTD Benefit Program defines "treatment" (a term synonymous with medical care or services) to include consulting with a doctor, receiving care or services from a doctor or from other medical professionals a doctor recommends you see, or receiving diagnostic measures. None of these types of treatment require a correct diagnosis of the disease at the time the treatment is provided; in fact, they do not even require that the disease be suspected at the time the treatment is provided. Instead, they all envision treatment of an undiagnosed or unsuspected sickness, presumably as part of a process of reaching a correct diagnosis.

This language makes it clear that the Plan does not require that the doctor or the patient diagnose or suspect during the pre-existing period that the patient has the specific underlying sickness that is ultimately diagnosed. Rather, the Plan requires that, during the pre-existing period, the patient had an underlying sickness and that he or she received one of the types of medical care or treatment specified in the Plan's documents for that sickness. Consequently, the "for which" language in the Plan does not require that the doctor intend to provide treatment for a specific diagnosed or suspected sickness. Instead, it requires that the patient receive medical care or treatment "becuase of" the underlying sickness, regardless of whether that sickness is diagnosed or suspected. Indeed, this is in keeping with the definition of for. *Webster's Third New International Dictionary, Unabridged*

22

(2002), *available at* http://unabridged.merriam-webster.com (13 Oct. 2009) (noting that "for" means "8 a : because of").

In this case, Dr. Bloomfield's report stated that Mitzel "became ill in October 2003 with Wegner's" and that she had "multiple" medical visits and examinations during the pre-existing period for "symptoms which were eventually diagnosed as Wegner's." (AR 93). Consequently, Mitzel had a sickness (WG) during the pre-existing period and she received medical care and treatment as defined under the plan (doctor visits, diagnostic tests, and diagnostic measures) because of or for that sickness. The fact that Mitzel and her doctors did not suspect or correctly diagnose the specific sickness that she had (WG) during the pre-existing period is not relevant because the Plan's language simply does not require the doctors (or Mitzel) to diagnose or suspect the actual sickness that they were providing treatment for during the pre-existing period. To redefine the Plan to require knowledge or suspicion of the specific sickness that the patient is seeking treatment for is to redefine the plain words of the Plan – to add additional requirements to the Plan. Since I am unwilling to do this, I would reverse the district court and uphold Anthem's denial of benefits.

**Holschuh, District Judge, concurring in the affirmance of the judgment.** I fully agree with Judge Clay that the Magistrate Judge's decision should be affirmed and that Mitzel's long-term disability benefits should be reinstated. However, I reach that conclusion for somewhat different reasons.

## I. Any Error of the Magistrate Judge in Relying Solely on the Definition of a "Pre-Existing Condition" Contained in the LTD Benefit Booklet was Harmless.

The first issue on appeal is whether the Magistrate Judge erred in relying solely on the definition of a "pre-existing condition" contained in the LTD Benefit Booklet without first considering whether it conflicted with the definition contained in the LTD Benefit Program. I find that he did err but that the error was harmless.

As Judge Clay notes, the definition of a "pre-existing condition" contained in the LTD Benefit Program includes language that the LTD Benefit Booklet does not; namely, the LTD Benefit Program includes within its definition of a "pre-existing condition" a sickness or injury "where symptoms were present to the degree that an ordinarily prudent person would seek treatment." (AR 404.) To the extent that this additional language presents a potential conflict, it is irrelevant in this case, because it is undisputed that Mitzel sought and received medical treatment during the look-back period. The *relevant* portions of the two definitions are substantially alike. Therefore, no matter which document is consulted, the outcome remains the same, and the error was harmless.

## II. The Plan Administrator Acted in an Arbitrary and Capricious Manner

### A. The Plan Administrator Did Not Interpret the Plain Meaning of the Language as It Would Be Construed by an Ordinary Person.

24

The second, and more substantial, issue on appeal is whether the Magistrate Judge erred in finding that the Plan Administrator acted in an arbitrary and capricious manner in denying Mitzel's claim for long-term disability benefits. Relying on *Lawson v. Fortis Insurance Co.*, 301 F.3d 159 (3d Cir. 2002) and *McLeod v. Hartford Life & Accident Insurance Co.*, 372 F.3d 618 (3d Cir. 2004), the Magistrate Judge found that the Plan's definition of "pre-existing condition" was ambiguous. Then, applying the rule of *contra proferentem* and construing the ambiguity against the drafter, he concluded that Anthem's denial of Mitzel's claim was arbitrary and capricious. Like my colleagues, I find that the Magistrate Judge erred in applying the rule of *contra proferentem*. That rule simply has no application in ERISA cases subject to an arbitrary and capricious standard of review.

Nevertheless, like Judge Clay, I find that despite the error in applying this rule, the Magistrate Judge reached the right result, and Anthem did act in an arbitrary and capricious manner in denying Mitzel's claim for benefits. In ERISA actions, the insurer has the burden of proving that an exclusion applies. *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). I agree with Judge Clay that Anthem has not met its burden in this case.

I write separately on this issue only because I am not convinced that the LTD Benefit Booklet's definition of a "pre-existing condition" is unambiguous. The LTD Benefit Booklet defines a "pre-existing condition" as a sickness or injury *"for which* you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage." (AR at 350) (emphasis added.) As the Magistrate Judge noted, courts considering the same or similar language have reached conflicting results, leading to the conclusion that the definition is subject to more than one interpretation. (ROA at 347.)

25

I agree that plan administrators are given leeway in interpreting ambiguous terms in plan documents. *See Moos v. Square D. Co.*, 72 F.3d 39, 42 (6th Cir. 1995). However, that discretion is not completely unfettered. "[F]ederal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Of great importance is the rule that, "[i]n interpreting the provisions of a plan, a plan administrator must adhere *to the plain meaning of its language as it would be construed by an ordinary person*." *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund*, 203 F.3d 926, 934 (6th Cir. 2000) (emphasis added.)

In my opinion, an ordinary person would *not* construe the LTD Benefit Booklet's definition of a "pre-existing condition" to include a sickness that was neither diagnosed by the employee and the employee's treating physicians nor its existence even suspected during the exclusionary period. The language "for which" connotes intent, and "it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists." *Lawson*, 301 F.3d at 165. When neither the patient nor the physician even suspects a particular illness, it is patently unreasonable to find that the patient received medical care or services "for" that condition. The ordinary Anthem employee is not an attorney or a linguistician, and while the language of the pre-existing condition exclusion can be parsed and debated in briefs and in courtroom oral arguments, the plan administrator is required by law to interpret this language "as it would be construed by an ordinary person." *Shelby County Health Care Corp.* 203 F.3d at 934.

At oral argument, Anthem relied heavily on the case of *LoCoco v. Medical Savings Insurance Co.*, 530 F.3d 442 (6th Cir. 2008), in urging this court to vacate the judgment below. *LoCoco*,

26

however, is clearly distinguishable. In that case, during the exclusionary period, LoCoco, a smoker, was admitted to a local emergency room complaining of a cough and shortness of breath. A chest x-ray revealed a "cloud" in his left lung. The diagnosis was pneumonia, but a CAT scan was ordered because cancer was suspected. As Dr. Bhullar, who ordered the CAT scan, said, "[w]henever you see something like [pneumonia] in a smoker, you have to follow up for cancer of the lung." *Id.* at 444. In addition to the CAT scan, a bronchoscopy was suggested. This procedure is ordered only when there are "very strong indications" of disease. *Id.* Dr. Bhullar also referred LoCoco to Dr. Lenky, "a pulmonologist who often treated patients with lung cancer." *Id.*

Although LoCoco was not definitively diagnosed with lung cancer prior to his insurance policy's effective date of coverage, the insurance company found that he had a "pre-existing condition," *i.e.*, lung cancer, and denied his claim. This court upheld that decision. The insurance policy at issue defined a "pre-existing condition" as ". . . an illness . . . for which medical advice, diagnosis, care, or treatment . . . was recommended or received from a licensed health practitioner during the 12 months immediately preceding the effective date of coverage." This court held as follows: "[h]ere, Mr. LoCoco had a 'pre-existing condition' because prior to the effective date of coverage (May 29, 2002) he had an 'illness' for which medical 'diagnosis' was 'recommended' from a doctor. he illness, moreover, was an ailment that was suspected at the time to be, and was in fact, lung cancer." *Id.* at 446. "Even though Mr. LoCoco had not received a definitive diagnosis on the effective date of coverage, diagnosis of his illness was recommended from a doctor prior to that date. Moreover, his undisputed medical history was highly suggestive of lung cancer." *Id.* In *LoCoco,* "pre-policy advice and recommendations were given in this case 'for' lung cancer because, at the time

27

provided, there were strong indications that Mr. LoCoco's condition was lung cancer." *Id.* at 448.

In short, there was undisputed evidence that, during the look-back period, LoCoco's treating physicians suspected lung cancer and had suggested tests to either confirm or rule out that particular diagnosis.

In sharp contrast to *LoCoco*, there was absolutely nothing in Mitzel's medical history or her condition during the look-back period that suggested to any of her physicians the possibility that she had Wegener's granulomatosis. Mitzel was not diagnosed with Wegener's granulomatosis until after the effective date of coverage, and it is undisputed that, during the look-back period, Dr. Arsuaga, Mitzel's treating physician, never even suspected that Mitzel had that disease. In fact, Dr. Arsuaga has stated:

> the only abnormality noted was a rash and a borderline antinuclear antibody speckle pattern 1:80 titer. No other abnormality was noted to suggest the diagnosis of Wegener's granulomatosis. At that time she did not meet the criteria for that diagnosis. If anything we were considering the remote possibility of systemic lupus erythematosus but she did not meet enough criteria either.

(AR 49.) At one point, Dr. Arsuaga considered referring her to an ear-nose-throat surgeon for a biopsy to confirm a possible diagnosis of lupus (AR 139.) Clearly, an ordinary person would not find that Dr. Arsuaga provided Mitzel with medical care or services "for" Wegener's granulomatosis during the three months prior to her effective date of coverage.

The critical distinction between the two cases is that whereas *LoCoco* clearly involved "a suspected condition without a confirmatory diagnosis," the present case clearly involves "a

misdiagnosis or an unsuspected condition manifesting non-specific symptoms." *LoCoco*, 530 F.3d at 448 (quoting *Lawson*, 301 F.3d at 166).[1]

In considering Mitzel's claim for benefits, Anthem employed physicians who simply reviewed Mitzel's medical records and gave opinions, in hindsight, that some of the symptoms which Dr. Arsuaga believed were symptoms of lupus were also consistent with the unsuspected diagnosis of Wegener's granulomatosis. Based on these opinions, and without even acknowledging the opinions of Mitzel's treating physicians, Anthem determined that Mitzel had received medical care or services "for" Wegener's granulomatosis during the look-back period, and that the pre-existing condition exclusion therefore applied.

Courts have rightly expressed concern with this type of "after-the-fact analysis of only non-specific symptoms." *LoCoco*, 530 F.3d at 448. In *Lawson*, the Third Circuit noted as follows:

> [C]onsidering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. "To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial." *In re Estate of Monica Ermenc*, 585 N.W.2d at 682.

*Lawson*, 301 F.3d at 166. *See also McLeod*, 372 F.3d at 625 ("The problem with using this type of ex post facto analysis is that a whole host of symptoms occurring before a 'correct' diagnosis is

---

[1] In the former case it is not unreasonable to deny benefits when a person is treated for a suspected sickness during the look-back period and it is later confirmed by a definitive diagnosis. It is totally unreasonable, however, in the latter case to deny benefits when a person is misdiagnosed and is treated for an entirely different sickness during the look-back period. No ordinary person would find that to be a reasonable interpretation of the Plan's definition of a pre-existing condition.

rendered, or even suspected, can presumably be tied to the condition once it has been diagnosed. Thus, any time a policy holder seeks medical care of any kind during the look-back period, the 'symptom' that prompted him to seek the care could potentially be deemed a symptom of a pre-existing condition, as long as it was later deemed consistent with symptoms generally associated with the condition eventually diagnosed."). I agree with these concerns. Not only is this "after-the-fact" analysis absolutely contrary to how an ordinary person would construe the Plan's definition of a "pre-existing condition," but it is also inconsistent with the purpose of ERISA. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (noting that Congress enacted ERISA "to promote the interest of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.").

**B.      The Plan Administrator also Ignored a Basic Principle of Contract Law.**

I also find that the Plan Administrator's interpretation of the language "for which you received medical care or services" is contrary to a basic principle of contract law. Group benefit plans governed by ERISA are interpreted by the federal courts using "'general rules' of contract law as part of the federal common law." *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002). Under federal common law, "ERISA plans, like contracts, are to be construed as a whole." *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir.1992); *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007).

Even if the "for which" language in the LTD Benefit Booklet, standing alone, is considered ambiguous, there is another explanation of a pre-existing condition in the plan documents that does

*not* contain the words "for which." Article 7 of the "Anthem Flexible Benefits Plan and Summary Plan Description" reads as follows:

> Article 7: Circumstances Which May Affect Benefits
>
> Your benefits and the benefits of your eligible family members will cease when your participation in the Plan terminates. See Article 4 above.
>
> Your benefits will also cease upon termination of the Plan.
>
> Other circumstances can result in termination, reduction, or denial of benefits. For example, benefits may be denied under the medical Benefit Program *if you have a pre-existing condition and incur costs **for treatment of that condition** within the exclusionary period*. Please consult the applicable summary plan description, which is available on the HR intranet site, for additional information.

(ROA 146) (emphasis added.)[2]

The example requires that costs must be incurred by the employee for "treatment *of that condition*" within the exclusionary period before there can be a denial of benefits. The ordinary person could easily understand that if the employee spends money for treatment of a known condition during the exclusionary period, and it later is discovered by the Plan Administrator that this particular condition existed before the effective date of the coverage, the employee will be denied coverage. On the other hand, if, for example, a jaundiced employee suffering from abdominal pain is diagnosed during the look-back period with gallstones and later dies of pancreatic cancer after the effective date of coverage, would the ordinary employee believe that, because jaundice is a

---

[2] While the example refers to the Medical Benefit Program, that program, like the Long Term Disability Benefit Program, is one of seven component benefit programs. See Article 2 of the Anthem Flexible Benefits Plan and Summary Plan Description. Since the Plan must be construed as a whole, there is no reason why this example should not also apply to the Long Term Disability Benefit Program.

symptom of both conditions, the employee received treatment for pancreatic cancer during the look-back period? I think not. In such a case, the employee did not incur costs for the "treatment of *that condition*," *i.e.*, pancreatic cancer, during the exclusionary period.[3]

Article 7, therefore, clarifies any ambiguity that exists with respect to the definition at issue. *See Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996) (finding that ambiguous language in one portion of an ERISA plan was resolved by reference to the clear and unambiguous language in another portion of the plan).

## III. Conclusion

For the reasons stated, under the circumstances presented here, the Plan Administrator interpreted the language in a manner that was not only contrary to the interpretation required by the law in this Circuit, *i.e.* "as it would be construed by an ordinary person," but also contrary to the federal common law requiring that all provisions of a plan must be construed as a whole. The Plan Administrator's interpretation, therefore, was arbitrary and capricious, and the judgment of the district court should be affirmed.

---

[3] Jaundice can be a symptom of pancreatic cancer as well as gallstones. WebMD, *Pancreatic Cancer Symptoms, at* http://www.webmd.com/cancer/pancreatic-cancer/pancreatic-cancer-symptoms (last reviewed by Louise Chang, MD Mar. 4, 2009); WebMD, *Gallstones-Symptoms*, *at* http://www.webmd.com/digestive-disorders/tc/gallstones-symptoms (last updated Aug. 2, 2007).